UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA

vs.                                    5:17-mj-523

PATRICK D. ANGELO,

                        Defendant.
------------------------------------------------------x

*Detention Hearing* – December 8, 2017

James Hanley Federal Building, Syracuse, New York

HONORABLE THÉRÈSE WILEY DANCKS

United States Magistrate Judge, Presiding


A P P E A R A N C E S

For Government:      OFFICE OF THE UNITED STATES ATTORNEY
                     100 State Street
                     Rochester, New York 14614
                       BY:  CRAIG GESTRING, ESQ.
                            Assistant U.S. Attorney

For Defendant:       FEDERAL PUBLIC DEFENDER'S OFFICE
                     NORTHERN DISTRICT OF NEW YORK
                     4 Clinton Square
                     Syracuse, New York  13202
                       BY:  RANDI JUDA BIANCO, ESQ.


*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

*USA v. Patrick D. Angelo – Detention Hearing*                    2

1        THE CLERK:  The Court calls United States versus

2   Patrick Angelo, case 5:17-mj-523.  Counsel, please note your

3   appearance for the record.

4        MR. GESTRING:  Good afternoon, Your Honor.  Craig

5   Gestring, Assistant United States Attorney, on behalf of the

6   United States.

7        THE COURT:  Good afternoon, Mr. Gestring.

8        MS. BIANCO:  Good afternoon, Your Honor.  Randi

9   Bianco and Juan Rodriguez and behalf of Patrick Angelo.  Also

10  present in the courtroom are his parents.

11       THE COURT:  Good afternoon, Ms. Bianco,

12  Mr. Rodriguez, Mr. and Mrs. Angelo, and Mr. Angelo.

13       We are here for the detention hearing.  Since we

14  were last together, I want to make sure that everybody got

15  the updated reports and information.  I have in front of me a

16  Pretrial Services Report dated September 21 of 2017, an

17  addendum of today's date, December 8.  I also have

18  Dr. Lazzaro's report dated December 7th.  And then I have the

19  parents' letter of November 30th as well.

20       Mr. Gestring, do you have all of those documents?

21       MR. GESTRING:  Judge, I have received both of the

22  Pretrial Services Reports; the original report dated 1

23  December as well as the addendum dated today.  I have had an

24  opportunity to review both of those.  We likewise received

25  and reviewed the 7 December report from Dr. Lazzaro.  I have

1  not seen the parents' letter, but I think I can probably

2  proceed without it at this point.

3           THE COURT:  That came before the last hearing.  I

4  have a copy if you would like to see a copy of it.

5           MR. GESTRING:  Thank you, Judge.  May I approach?

6           THE COURT:  Yes.  Ms. Bianco, you have all of those

7  documents?

8           MS. BIANCO:  I do, Your Honor.

9           THE COURT:  All right.  Mr. Gestring, when you're

10  ready to proceed.

11           MR. GESTRING:  Thank you, Judge.  I've reviewed the

12  letter dated 30 November, returning it to the Court.

13           THE COURT:  Thank you.

14           MR. GESTRING:  Judge, it appears the letter is

15  consistent with the material in the Pretrial Services

16  Addendum, so I don't think there is anything new or unique in

17  there.

18           Your Honor, it's the United States' position that

19  there are no condition or set of conditions that could

20  adequately protect the public, and specifically the victim,

21  from this defendant.  It's the position of the United States,

22  Judge, that the defendant is a danger to the community, and

23  we believe that we can establish that through clear and

24  convincing evidence.

25           Judge, I think initially we need to review the

*USA v. Patrick D. Angelo – Detention Hearing*                    4

1   facts of the case.  Specifically, this defendant is charged

2   with making a direct threat to kill the United States

3   Congressman and his family.  The threat was made on or about

4   19 October, was left at the congressional office of the

5   victim.  The death threat was graphic and aimed at the victim

6   and his family.  The death threat specifically linked the

7   threat to the performance of the victim's official duties,

8   Your Honor.

9           Judge, at this time I would play into the record

10  the recordings of the threat call.  For the record, I have

11  previously made this available to defense counsel, as well as

12  probation.

13          THE COURT:  All right.  Any objection, Ms. Bianco?

14  And you've heard it?

15          MS. BIANCO:  I've heard it, yes, Your Honor.  No

16  objection.

17          (Audio recording played.)

18          MR. GESTRING:  Your Honor, that's where the

19  recording terminates.  Judge, the call was traced to a 315

20  phone number, area code (315)521-0141.  The case was

21  investigated by the United States Capitol Police initially,

22  who referred it to the Federal Bureau of Investigation for

23  follow-up investigation.

24          In review of the 18 U.S.C. 4132(g) factors favors

25  detention.  First, the offense, the nature and

1    characteristics of the offense.  Judge, he is charged with

2    two significant crimes; 875 is a five-year felony and the 115

3    violation is a ten-year felony.  Clearly it was a

4    congressional intent to take threats made in interstate

5    commerce, as the 875, or with respect to an official victim,

6    as the 115, very seriously.

7            Judge, the defendant made a direct threat to kill a

8    Congressman and his family.  The threat was delivered clearly

9    and with chilling clarity.  The threat related directly to

10   his official duties.  It specifically related to his

11   consideration of a piece of legislation that is currently

12   before the United States Government and was directly related

13   to his duties as a United States Congressman.

14           Disturbingly, Judge, as the Court heard, and I

15   think is evident from the filings earlier, specifically the

16   criminal complaint which relates to the content of the

17   threat, the call ends with the defendant saying that he would

18   give his life in furtherance of his cause.  As the Court is

19   aware, any type of threat followed up with a willingness to

20   die in furtherance of that threat, that's a chilling

21   prospect, Your Honor.

22           The Court is probably aware of the net neutrality

23   issues that are presently in the news.  There is an FCC vote

24   next week I think it's scheduled.  I would note that as

25   recently as yesterday there were nationwide protests in

1   support of various positions with respect to net neutrality

2   around the country, specifically boycotting Verizon locations

3   and other locations, and it clearly shows the passions of the

4   people on both sides of the issues with respect to net

5   neutrality, Judge.  And that's a factor under the nature and

6   circumstances I think the Court can and should take into

7   consideration.

8           Judge, with respect to the weight of the evidence,

9   I think that's strong as well and also favors detention.

10  Specifically, as the Court heard, we have a recording of the

11  death threat and the defendant's voice is both unique with a

12  speaking pattern.  We've identified the calling number.  We

13  have phone numbers, including subscriber records, which trace

14  that telephone back to the defendant.  I would also note that

15  at the time of his arrest, he was in possession of that very

16  same telephone, Judge.

17          Further, the FBI on two occasions contacted the

18  defendant on that same telephone, the telephone number that

19  was identified as making the threat against the Congressman

20  and his family, and the FBI twice called that number and

21  spoke to the defendant on that number.

22          Judge, in the course of a noncustodial interview

23  with the defendant, he made several admissions.  He admitted

24  making the call; he admitted that he used strong language; he

25  admitted that it probably could have been construed as a

1  threat; and he terminated it by saying I'm sure they didn't

2  appreciate it.

3          Judge, significantly, after his arrest he also made

4  spontaneous statements to the FBI, "You guys got a big score

5  tonight," and "I made the call, you're just doing your job,

6  this just seems a bit ridiculous," as if to somehow

7  underscore his activities but obviously admitting the conduct

8  itself.

9          Judge, further, under the 3142(g) factors with

10  respect to the personal characteristics, it's the

11  government's position that those do not support release; in

12  fact, they favor and support detention.

13          The defendant's character, Judge, there has been

14  discussion about his access to firearms.  There has also been

15  discussion about his training regimen with respect to

16  firearms.  And I understand there's some disagreement between

17  the position set forth in the Pretrial Services Report as

18  well as the defendant's position whether he was formally

19  going to a shooting range or whether he was informally

20  receiving firearms training from a friend of his, but

21  ultimately, a man who is threatening to kill a Congressman

22  who has weapons and is training those weapons is a dangerous

23  combination.

24          There is also information in the December 8

25  addendum related to books that specifically the Probation

1   Officer noted some of the books dealt with assassination of

2   presidents.  Defense counsel indicated one of the books was

3   *Killing Lincoln*.  I would note that the subtitle of that book

4   is *The Shocking Assassination That Changed America Forever.*

5   And I understand the defendant is a history major and that

6   absolutely an innocent just simple possession of that book in

7   and of itself is not enough to merit detention, but certainly

8   in the context of everything we have here is a concern for

9   the government, and we submit should be a concern for the

10  Court under 3142 and which should support detention.

11        He has previously expressed strong animosity for

12  law enforcement, especially federal law enforcement.  He was

13  described in his own psychological report as both rebellious

14  and anxious, which is a bad combination, Judge, when given

15  the other materials.

16        With respect to the defendant's physical and mental

17  condition, we're not aware of any physical condition which

18  would support his release.  Certainly with respect to his

19  mental conditions, I know the Court was concerned, the

20  parties were concerned to the extent that we arranged for

21  Dr. Lazzaro to conduct his interview with the defendant and

22  provide a psychological evaluation report, which he did

23  yesterday.  Judge, we have some significant concerns about

24  the contents of that report, as well as Dr. Lazzaro's

25  conclusion where Dr. Lazzaro does conclude that Mr. Angelo

*USA v. Patrick D. Angelo – Detention Hearing*                9

1   will not be a danger to himself or others, however the

2   supporting --

3          THE COURT:  Get to that for me because he does

4   ultimately conclude that he doesn't think he would be a

5   danger.

6          MR. GESTRING:  He does, Judge.  And I think there

7   is some concerns within the report itself.  I think it's

8   internally inconsistent and doesn't appear to support that

9   conclusion.  I think as a threshold matter, I don't think the

10  defendant was truthful in the context of the report.

11  Specifically, he understated his law enforcement contacts.

12  He only mentioned one contact with respect to the marijuana

13  use, but the probation Pretrial Services Addendum on

14  December 8th references multiple contacts, up to and

15  including finding the defendant unconscious secondary to

16  alcohol.

17         THE COURT:  There was a college reference?

18         MR. GESTRING:  Correct.  It also references an

19  incident with a book store and some stolen materials as an

20  employee.  So I think there is some concerns there, Judge.

21         I think on page 2 under the clinical interview

22  Dr. Lazzaro indicates that the defendant also denied -- I'm

23  looking at the second paragraph from the bottom of the page

24  under clinical interview, that the defendant also denied any

25  history of substance abuse.  That appears to be inconsistent

1    with what we know, as well as what probation was able to

2    determine, about the defendant's prior history of substance

3    abuse, up to including again being found unconscious while he

4    was at school, and some marijuana use related to that, Judge.

5            With respect to some of the conclusions,

6    Dr. Lazzaro posited at several points that he feels that the

7    defendant has -- I'm looking at the bottom of page 3 -- these

8    profiles both fall within normal limits and suggest no mental

9    health diagnosis.  The middle of that page, further evidence

10   of the lack of organically based neuropsychological deficits.

11   However, he then posits further that the defendant could

12   benefit from some type of psychotropic medications.  Those

13   conclusions appear to be inconsistent.  You can't say that he

14   has no psychological problems and yet say that he would

15   benefit from psychotropic medications.

16           Further, Judge, I think in the personality

17   evaluation, much of that is subjective, not objectively

18   verified.  To the extent that again there is a discussion of

19   Mr. Angelo's alcohol use, it says Mr. Angelo received a score

20   of 2 on the Michigan Alcohol Screening Test, which is

21   consistent with his denial of any history of substance abuse.

22   I think we already have other information, certainly from

23   probation's report, that that may not be entirely accurate.

24   So I think there is a concern about the information that was

25   given to Dr. Lazzaro to formulate his opinion.

1          On the final page, page 5, he indicates that the

2    reports would support the idea that the defendant is

3    gregarious, social, and an outgoing individual with adequate

4    ego strengths, but then later on posits that he may be

5    depressed, requiring some type of psychotropic medications.

6    To the extent those are inconsistent, I think we can't put

7    too much weight on this report or what appears to be an

8    outcome determinative conclusion of the doctor.

9          With respect to family ties, it's clear that the

10   defendant has a loving family that appeared at every court

11   appearance.  I think his father was here for the initial

12   appearance, his parents were here for last week's appearance,

13   and I would note that they're both here and obviously very

14   concerned about that.  And as indicated by the letter which

15   was presented to the Court, they are very supportive of their

16   child.

17          However, Judge, I would note two things, one of

18   which is that he had all of that support at the time he

19   committed this crime, and none of that support stopped him

20   from committing this crime.  Further, Judge, as indicated in

21   the addendum to the Pretrial Services Report, it appears that

22   at least one of the parents is not aware of or sort of

23   underreports the worries about the defendant's alcoholism or

24   his substance abuse problem.  And I guess the concern there

25   would be that the family ties don't sufficiently mitigate the

*USA v. Patrick D. Angelo – Detention Hearing*                    12

1    activity to support any type of release.

2           With respect to employment, Your Honor, it's our

3    understanding that the defendant, while he was formally

4    employed, is no longer so, and, therefore, that no

5    considerations of employment would stop him from acting out

6    or committing further crimes.

7           His residence in the community is somewhat fluid.

8    He has moved around a lot.  He has some stable history back

9    when he was living with his parents; that's no longer the

10   case.  To the extent the Court is concerned about that, if he

11   lives back in Geneva in the Western District, I think that

12   could go either way, Your Honor.

13          THE COURT:  What do you mean by that?

14          MR. GESTRING:  I mean that his living

15   accommodations here appear to be transient, meaning that he

16   doesn't have substantial roots here or in any one of these

17   residences where he is now.  He has been moving around a lot

18   and --

19          MS. BIANCO:  I'm going to object.  I thought we

20   weren't proceeding on the ties to the community, risk of

21   flight.  So what is this all about?

22          MR. GESTRING:  Well, Judge, I think it's a 3142(g)

23   factor.

24          THE COURT:  And I asked him a question to explain

25   it, Counsel.  Your objection is overruled.

1          MR. GESTRING:  I would also note that the Pretrial

2    Services Report does indicate travel outside of the United

3    States as recently as three weeks ago.  The defendant had a

4    passport at the time, traveled to Canada, has other foreign

5    travel as well.

6          Judge, the government is not aware of any other

7    criminal history or past conduct other than that which is

8    referred to in the Pretrial Services Report.  But certainly I

9    think that we do agree with Pretrial Services' conclusion

10   with respect to electronic monitoring.  To the extent that

11   the Court would consider that an adequate protection for

12   either the Congressman or his family or society, we think

13   that would not be adequate.  It would certainly not prevent

14   him from committing the crime he is charged with.  He

15   certainly could make the threats while he is on electronic

16   monitoring.

17          Further, Judge, it would not be sufficient to

18   prohibit him from actually traveling.  I think Pretrial

19   Services does a very good job of setting forth how in this

20   case the electronic monitoring would be insufficient to

21   physically limit the defendant.  There would be concerns

22   about even if he did travel, who would then know about it,

23   who would be notified about it, what to do at that point.

24   Those safeguards would not be sufficient, Judge, in our

25   opinion to adequately safeguard the public or the victim.

*USA v. Patrick D. Angelo – Detention Hearing*

1      Ultimately, Judge, on those facts and as we move

2 forward, it's our position that there are no condition or set

3 of conditions which would adequately protect the public,

4 which this Court could set which would adequately protect the

5 public from the defendant.

6      THE COURT:  Just so I'm clear, you don't think he

7 is a risk of flight, though?  I just want to clarify.

8      MR. GESTRING:  No.  It's not our position that he's

9 a risk of flight.  I think I previously tendered to the Court

10 that he was contacted twice by the FBI, he returned their

11 calls, he met with them voluntarily.  So we're not proceeding

12 under that theory, Your Honor.

13      THE COURT:  Thank you.  Ms. Bianco.

14      MS. BIANCO:  Your Honor, before we begin, I guess I

15 question under what basis the government is moving for

16 detention, whether it's under 18 3142(f)(1), that this is a

17 crime of violence, or under (2), that he is a risk of flight

18 and a serious risk that he will obstruct or attempt to

19 obstruct justice.  I don't believe that 18 U.S.C. 3142(1)

20 applies that this is a crime of violence.  Specifically,

21 under the *Johnson* case, which struck down the residual clause

22 as vague and overbroad and unconstitutional, a crime of

23 violence must involve physical force that could result in

24 pain.  If you can do it without that kind of force, it's not

25 a crime of violence.  "Violent force, force capable of

*USA v. Patrick D. Angelo – Detention Hearing*                    15

1    causing physical pain or injury to another."  And I'm citing

2    559 U.S. 133 at 140.

3              You can threaten someone without using force at

4    all.  So I would contend that this is not a crime of violence

5    and that the standard that this Court should be looking at is

6    under 18 U.S.C. 3142(2).  And there is two specific prongs

7    under that.  The government could move for detention if there

8    is a serious risk that the person will flee.  Well, the

9    government's not moving on a risk of flight.  And the second

10   basis is a serious risk that such person will obstruct or

11   attempt to obstruct justice, or threaten, injure, or

12   intimidate, or attempt to threaten, injure, or intimidate a

13   prospective witness or juror.

14             So that's a completely different standard, Judge.

15   And I would note under 18 U.S.C. 3142(b) it mandates pretrial

16   release unless the Court determines that such release will

17   not reasonably assure the person's appearance or will

18   endanger the safety of any person or the community.  And,

19   specifically, the Court should set the least restrictive

20   conditions necessary to reasonably assure the person's

21   appearance and the community's safety.  But the provision

22   that the conditions reasonably assure appearance and safety

23   does not require a guarantee of appearance or safety.  And

24   I'm citing *United States versus O'Brien,* 895 F2d 810 (First

25   Circuit 1990); *United States versus Fortna*, 769 F2d 243

*USA v. Patrick D. Angelo – Detention Hearing*                    16

1  (Fifth Circuit 1985.)

2         Judge, in reading the addendum to the Pretrial

3  Services Report and why they are recommending detention, I

4  want to address some of those issues.  Specifically, they

5  talk about contact with the police and unlawful possession of

6  marijuana, and that apparently was two incidents.  He was not

7  convicted of anything.  Both of those charges were dismissed.

8         They talk about an event that happened at a book

9  store.  He was not charged with any crime at the book store.

10 The book store handled it.

11        They talked about him becoming drunk and passing

12 out.  He was a freshman in college.  That was ten years ago.

13 So while that did happen, it was ten years ago.  There is no

14 indication that he has committed any type of crime in the

15 last several years for the Court to be concerned.

16        With regards to the books that were on his shelf,

17 first of all, we weren't provided with the names of any of

18 these books, photos of these books, how many books there

19 were, but from my understanding from both my client and his

20 father, there were a couple of Bill O'Reilly books, the

21 *Killing of Lincoln* and another killing of somebody, but it

22 was a Bill O'Reilly best selling book that his father bought

23 him.  He was a history major in college and had a shelf full

24 of history books and text books, so these books are not

25 dispositive that he tried to kill someone.

1          With regard to the gun, the gun that was found is

2    one long gun.  It had not been used in over one year.  He had

3    went to learn how to use the gun on the reservation with a

4    friend who was trying to teach him.

5          THE COURT:  What's the basis of your proffer that

6    the gun hadn't been used within over a year?

7          MS. BIANCO:  That's what my client advises me, had

8    not been used in over one year.  He went -- he was trying to

9    learn how to use the gun with his friend.  He didn't belong

10   to a shooting range.  He didn't take official lessons.  But

11   his friend was trying to teach him how to use the gun.  But

12   the gun has no connection to this particular case.

13         I notice that the government played the call, the

14   call that occurred in October, which was a little more than a

15   minute long, maybe seventy seconds.  In the call the person

16   who's speaking appears to be slurring his words, appears to

17   be intoxicated.  And you'll note that the call ends halfway

18   through a sentence, which is apparently when the answering

19   machine shuts off.

20         The caller never calls back to continue the threat,

21   not that night or not any other night.  My client was not

22   arrested until December.  There is no allegation whatsoever

23   that he tried to call the Congressman or he tried to attempt

24   to see the Congressman in any way, shape or form between the

25   time of the initial call and the time of his arrest.

1        At the time when he was interviewed by the FBI, he

2   met with the FBI once voluntarily, they asked to meet him

3   again, they arranged for a time, he couldn't make that time

4   so he called and said he would be late, and then he showed

5   up.  So, he voluntarily met with the FBI on two separate

6   occasions and this was some six weeks after the alleged call.

7        Judge, with regards to Dr. Lazzaro's report, I

8   notice that the government points out a number of different

9   things on the report that they contend are inconsistent.

10  Well, Dr. Lazzaro does a number of objective written tests

11  and he separates each test and their results.  The fact that

12  some of the tests are inconsistent with another does not mean

13  his report is inconsistent; it means the testing itself is

14  inconsistent in some respects.

15        Now, there were I believe seven separate subjective

16  tests and one objective test, which was the clinical

17  interview.  With regards to the fact that Dr. Lazzaro said he

18  may be suffering from depression and may need some type of

19  medication, he is apparently relying on the results of the

20  objective test, not the clinical interview.  The clinical

21  interview where my client appears gregarious to a certain

22  degree, it doesn't mean that he is not depressed or

23  clinically depressed, it means that the testing showed there

24  was some indication of depression.  And Dr. Lazzaro didn't

25  say he should get medicine, he said he may be given a

1   referral for medication, if deemed necessary, by a mental

2   health treating person.  It's not a definite depression, it's

3   a possibility, he is looking at that.

4          The guidelines in this case, in the event my client

5   were convicted, are 6 to 12 months.  The government can't

6   hold him forever.  There is no reason to believe that he

7   can't be released on conditions.  We'll agree with every

8   condition that the government proposed, and including

9   electronic home confinement, living with his parents, not

10  drinking, going to counseling, we'll agree with each and

11  every one of those conditions, and I think that can assure

12  that he is not a danger to the community.

13         The only evidence that the government cites that he

14  is, in fact, a danger is the call, the 70 second call, the

15  unrelated gun.  But they put the two together to say somehow

16  he is dangerous, along with the Bill O'Reilly books.  So

17  putting that all together, somehow he is a danger to the

18  community for a 70 second call seems a bit unreasonable,

19  especially when the guidelines call for a 6 to 12 month

20  sentence.  Criminal history category I, Zone B, jail isn't

21  even mandatory.

22         My client has never been to jail before.  He is a

23  college graduate.  He has a stable family with a stable home.

24  His parents have shown up each and every time.  And there is

25  no reason to believe that he can't follow the conditions of

*USA v. Patrick D. Angelo – Detention Hearing*

1  release.

2          For those reasons, Judge, I would ask you to

3  release him on the conditions that the government suggested,

4  and we would go along with that in addition to electronic

5  monitoring.  The only reason he doesn't have a job right now

6  is because he was fired from his job when he was arrested for

7  this offense.  He has a long history of employment.  He

8  worked at the Cheesecake Factory for six solid years, and

9  then he went to work at the Apnea Corporation where he was

10  working last.  But there is no reason to believe that he

11  wouldn't be able to work or that he has a sporadic work

12  history or he is somehow a fly-by-night.  He has lived in

13  three different areas in his life; Geneva, Albany, Syracuse.

14  Geneva, where he grew up; Albany, where he went to college;

15  and Syracuse, where he worked after he graduated from

16  college.

17          So he has substantial ties and he is not a risk of

18  danger.  And the report from Dr. Lazzaro, which is based on

19  objective testing, shows that he is not a risk of danger.

20          THE COURT:  One objective test and seven subjective

21  tests?

22          MS. BIANCO:  Well, Judge, I believe the objective

23  test was --

24          THE COURT:  I thought you said seven subjective?

25          MS. BIANCO:  No; seven objective, one subjective.

*USA v. Patrick D. Angelo – Detention Hearing*                    21

1          THE COURT:  All right.

2          MS. BIANCO:  The subjective test would have been

3    the clinical interview.

4          THE COURT:  Got you.

5          MS. BIANCO:  So the seven objective tests, which

6    are standardized, when someone fills them out they go through

7    the categories and they come up with their conclusions, he

8    has rated that he is not dangerous.  We have proof that he is

9    not dangerous.  And the government has not met their burden

10   to show that no condition or combination of conditions would

11   potentially threaten the community or the Congressman.

12          He is willing to stay away from the Congressman,

13   have an order of protection, not call, not having anything to

14   do with him or his family or any government agency regarding

15   net neutrality.  I mean, he is willing to abide by any

16   condition this Court would set.

17          THE COURT:  Thank you, Ms. Bianco.  Mr. Gestring,

18   anything else?

19          MR. GESTRING:  Judge, I think to the extent the

20   Court is concerned about *Johnson*, I think the 2010 decision,

21   clearly this is a 2017 statute, I think we're good to go as

22   far as that goes.  *Johnson* related to the residual exception,

23   as it came to be known, with respect to a Florida violent

24   felony and some crime of violence discussion, which was very

25   nebulous.  And the Florida battery statute that was at issue

1   in that case did not specifically refer to use or any type of

2   a threat or the same things which are contained in the

3   statute today, so I think we are good to go as far as that

4   goes, Judge.

5           THE COURT:  And it is a crime of violence, it is

6   your position?

7           MR. GESTRING:  It is.  Under 3142(f)(1)(A), the

8   requirement is a crime of violence plus a crime which is

9   punishable by imprisonment of ten years or more.  Clearly 115

10  satisfies that as one of the elements is the threatened use

11  of force against the individual.  And under 3156(a)(4)(A),

12  that which defines a crime of violence, it specifically says

13  an element of the crime is the use or threatened use of

14  force.  And it's clear from this case that the defendant

15  threatened the use of force against both the Congressman and

16  his family by virtue of ultimately killing them.

17          THE COURT:  Thank you.  Anything else, Ms. Bianco?

18          MS. BIANCO:  No, Your Honor.  Thank you.

19          THE COURT:  I'm going to take a five minute recess.

20          MR. GESTRING:  Thank you, Judge.

21          THE CLERK:  Court is in recess.

22          (Recess at 3:50.)

23          (Reconvene at 3:55.)

24          THE COURT:  I've given this a lot of thought before

25  today and I've reviewed all of the information before me,

1   including the Pretrial Services Report and Addendum,

2   Dr. Lazzaro's report, parents' letter, the arguments of

3   counsel, and I am going to order your detention, Mr. Angelo.

4          In considering the factors that I have to consider,

5   first of all, this is a crime of violence under the statute.

6   I don't agree with the defense's argument that it is not; I

7   agree with the government's argument that it is a crime of

8   violence.

9          I'll put all of this in an order, but in terms of

10  the nature and characteristics of the defendant, the threats

11  of violence to a public official and his family clearly

12  pertains to his official duties.  In listening to the

13  recording, you know, he left the message on the Congressman's

14  voicemail, and he has got a firearm and he is allegedly

15  taking shooting lessons, and there may be an indication that

16  he was drinking when he left the recording; however, he was

17  quite articulate and precise in the threat, and that gives me

18  pause.

19         And that coupled with Dr. Lazzaro's report in terms

20  of his findings that he is rebellious and anxious, the

21  alcohol abuse.  In terms of his characteristics when you

22  couple the alcohol abuse with this type of a threat and

23  firearms are involved, he is taking shooting lessons of some

24  kind, I find that he is a danger to the community, and I find

25  that the government met its burden by clear and convincing

1    evidence that he is a risk of danger.

2            The weight of the evidence is strong against the

3    defendant and the seriousness of the risk to the community,

4    as well as the Congressman and his family, are very prevalent

5    in the threat in and of itself.

6            So I will put all of this in an order, as I said,

7    and that will go up on the docket as soon as I can get it up

8    on the docket.  But I am ordering Mr. Angelo's detention at

9    this time.  All right.  So you're going to be remanded to the

10   marshals, Mr. Angelo.

11           And anything else from the government?

12           MR. GESTRING:  Not with respect to detention,

13   Judge.  I have had some communications with defense counsel

14   earlier today with respect to the next step in the case.  I

15   don't want to speak for her, but I believe that we'll be

16   having a status -- we'll provide some discovery at this

17   point, voluntary discovery to defense counsel with respect to

18   the investigation and it's my understanding that they'll be

19   requesting a status after the holidays.

20           THE COURT:  Get a speedy trial stip up on the

21   docket, too, if that's going to be necessary, because the

22   clock is running.  We had stopped it up until today, but the

23   clock is going to start ticking.

24           MR. GESTRING:  Yes.  I'm not familiar entirely with

25   the procedure, but if we can make an oral motion for the

*USA v. Patrick D. Angelo – Detention Hearing*                    25

1    tolling of the speedy trial clock in the interest of justice

2    pending the next status date, or if the Court would prefer to

3    have something filed in writing.

4              THE COURT:  I would prefer to have something filed

5    in writing.

6              MR. GESTRING:  Understood, Your Honor.  Thank you.

7              THE COURT:  Anything else from the defense?

8              MS. BIANCO:  No, Your Honor.

9              THE COURT:  The defendant is remanded at this time.

10             THE CLERK:  Court is adjourned.

11                  *              *              *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, EILEEN MCDONOUGH, RPR, CRR, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


_____

EILEEN MCDONOUGH, RPR, CRR
Federal Official Court Reporter